**MARC P. BERGER**
**REGIONAL DIRECTOR**
Lara Shalov Mehraban
Sandeep Satwalekar
Preethi Krishnamurthy
Christopher J. Dunnigan
Alison R. Levine
**Attorneys for the Plaintiff**
**SECURITIES AND EXCHANGE COMMISSION**
New York Regional Office
Brookfield Place
200 Vesey Street, Suite 400
New York, New York 10281-1022
(212) 336-0116 (Krishnamurthy)

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------------x

SECURITIES AND EXCHANGE COMMISSION,   :
  :
                     Plaintiff,   :
  :   **COMPLAINT**
   -against-   :
  :   18-CV-   (   )
JAMES BERNARD MOORE   :
and UNIVERSAL VOICETECH, INC.,   :   **JURY TRIAL**
  :   **DEMANDED**
                  Defendants,   :
  :
------------------------------------------------------------------------x

Plaintiff Securities and Exchange Commission ("Commission"), for its Complaint against

defendants James Bernard Moore ("Moore") and Universal Voicetech, Inc. ("Voicetech")

(collectively, "Defendants"), alleges as follows:

## SUMMARY

1.     From approximately mid-2015 through May 2016 (the "Relevant Period"),

defendants Moore and Voicetech, a company Moore controlled with his wife, recruited a network of

sales agents to sell fraudulent investments to investors and served as the sales agents' liaison to the

entities offering the fraudulent investments.

2.      Defendants arranged for the sales agent network to sell the investments by using the offering entities' false and misleading offering materials.

3.      Defendants knew these offering materials were false or misleading. Among other things, the materials touted the background of a chief executive officer, who in fact did not exist as Moore knew, and at the same time intentionally omitted any mention of Renwick Haddow, the real person controlling the entities, because, also as Moore knew, Haddow had been sued by a United Kingdom regulator for a prior scheme involving African land.

4.      During the Relevant Period, the network of sales agents recruited by Defendants raised over $5 million from at least 100 investors for the fraudulent investments.

5.      Defendants, in return for their role in selling the fraudulent investments, received commissions that totaled at least $1.4 million from the entities offering the investments.

6.      These investments are now effectively worthless due to the fraudulent scheme, including Haddow's misappropriation of investor funds for his own use.[1]

## VIOLATIONS

7.      By virtue of the conduct alleged here, Defendants have aided and abetted violations of Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)], Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

8.      Unless Defendants are permanently restrained and enjoined, they will again engage in the acts, practices, and courses of business set forth in this Complaint and in acts, practices, and courses of business of similar type and object.

---

[1]      The Commission filed a complaint, naming Haddow and entities he controlled as defendants and alleging that they committed securities fraud, in a related enforcement action, *SEC v. Renwick Haddow, et al.*, No. 17-cv-04950 (LGS) (S.D.N.Y.) (hereinafter "*SEC v. Haddow*").

## NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT

9.      The Commission brings this action under Securities Act Section 20(b) [15 U.S.C. § 77t(b)] and Exchange Act Section 21(d) [15 U.S.C. § 78u(d)]. The Commission seeks to permanently enjoin Defendants from engaging in the transactions, acts, practices, and courses of business alleged in this Complaint and seeks an order requiring Defendants to disgorge all ill-gotten gains from the unlawful conduct set forth in this Complaint, together with prejudgment interest. The Commission also seeks civil penalties against Defendants under Securities Act Section 20(d) [15 U.S.C. § 77t(d)] and Exchange Act Section 21(d)(3) [15 U.S.C. § 78u(d)(3)].

## JURISDICTION AND VENUE

10.      The Commission brings this action under the authority conferred by Securities Act Section 20 [15 U.S.C. § 77t(b)] and Exchange Act Section 21(d) [15 U.S.C. § 78u(d)].

11.      This Court has jurisdiction over this action pursuant to Securities Act Section 22(a) [15 U.S.C. § 77v(a)] and Exchange Act Section 27 [15 U.S.C. § 78aa]. Defendants, directly or indirectly, singly or in concert, have made use of the means or instrumentalities of transportation or communication in, or the instrumentalities of, interstate commerce, or of the mails, in connection with the transactions, acts, practices, and courses of business alleged herein.

12.      Venue lies in this district under Securities Act Section 22(a) [15 U.S.C. § 77v(a)] and Exchange Act Section 27 [15 U.S.C. § 78aa]. Certain of the transactions, acts, practices, and courses of business constituting the violations alleged herein occurred within the Southern District of New York. Among other things, Moore conducted certain of his unlawful practices through one or more meetings in New York, New York and by sending emails into New York, New York, including emails to Haddow and other representatives of the entities Haddow controlled.

## DEFENDANTS

13.      **Moore**, age 57, is a U.K. citizen who has lived in Miami Beach, Florida and Spain on and off since approximately 2010. In December 2016, Moore was arrested for his role in an alleged bank fraud unrelated to the conduct alleged in this Complaint, in a proceeding captioned *United States v. Moore et al.*, 16-cr-2011 (D. Kan.). In February 2018, Moore pleaded guilty to one count of misprision of a felony, in violation of 18 U.S.C. § 4, in the criminal proceeding after it had been transferred to the United States District Court for the Middle District of Florida. Moore has recently been awaiting his sentencing, scheduled for August 27, 2018.

14.      **Voicetech** is a Florida corporation that Moore and his wife, Voicetech's president, have controlled at all relevant times. During the Relevant Period, Voicetech purportedly engaged in real estate consulting, among other things.

## OTHER RELEVANT INDIVIDUAL AND ENTITIES

15.      **Haddow**, age 50, is a U.K. citizen who is currently in a federal detention center awaiting the disposition of a federal criminal proceeding against him, *United States v. Renwick Haddow*, 17-mj-04939 (UA) (S.D.N.Y.) (hereinafter "*U.S. v. Haddow*"). From approximately 2014 through May 2017, Haddow resided in New York, New York. On June 30, 2017, the Commission filed its complaint, alleging that Haddow committed securities fraud, in *SEC v. Haddow*. The same day, a criminal complaint against Haddow, which alleges facts arising out of the same conduct alleged in *SEC v. Haddow*, was unsealed in *U.S. v. Haddow*. On April 13, 2018, Haddow was arrested upon his extradition from Morocco.

16.      **Bar Works, Inc. ("Bar Works")** is a Delaware corporation whose principal place of business was in New York, New York at all relevant times. Haddow owns and at all relevant times controlled Bar Works, which offered short-term, shared office space in renovated bars in New York City and San Francisco. The Commission's complaint in *SEC v. Haddow* named Bar Works as a

defendant and alleged that it committed securities fraud. On January 18, 2018, the Commission

obtained a final default judgment against Bar Works. The default judgment ordered Bar Works to

pay disgorgement and prejudgment interest, jointly and severally with 7th Avenue, of over $37

million and a civil penalty of over $4.5 million.

17.     **Bar Works 7th Avenue, Inc. ("7th Avenue" and, together with Bar Works, the**

**"Bar Works Companies")** is a New York corporation whose principal place of business was in

New York, New York at all relevant times. Haddow formed and at all relevant times controlled

7th Avenue, which appears to have been created in connection with a Bar Works location on 7th

Avenue in Manhattan. The Commission's complaint in *SEC v. Haddow* named 7th Avenue as a

defendant and alleged that it committed securities fraud. On January 18, 2018, the Commission

obtained a final default judgment against 7th Avenue. The default judgment ordered 7th Avenue to

pay disgorgement and prejudgment interest, jointly and severally with Bar Works, of over

$37 million and a civil penalty of over $4.5 million.

18.     **Bar Works Management, Inc. ("Bar Works Management")** is a New York

corporation that Haddow founded and whose principal place of business was in New York, New

York at all relevant times. During the Relevant Period, Bar Works held out Bar Works Management

as Bar Works' wholly-owned subsidiary.

## FACTS

**I.     Haddow and the Bar Works Companies Defrauded Investors.**

**A.     Haddow Gained Notoriety in the U.K. for Previous Misconduct.**

19.     In approximately November 2008, the U.K.'s Insolvency Service—a U.K.

government agency whose work includes administering bankruptcies and disqualifying unfit

directors in corporate failures—disqualified Haddow from serving as a director of a company for

eight years.

20.     Haddow's misconduct as finance director of Branded Leisure plc, a company that would purportedly operate certain venues targeted at women ages 18 to 35, served as the basis of the disqualification.

21.     On December 10, 2008, the U.K. Insolvency Service issued a news release announcing the disqualification and noted: "The Schedule of Unfit Conduct which formed a part of the Disqualification Undertaking given by Mr. Haddow included…that he caused and/or allowed [Branded Leisure] to make inaccurate and misleading announcements…as to the progress of the company's building work, sales performance of the company, and the financial performance of the company…[and] [t]hat he caused and/or allowed the company to make false representations in a Board minute…in particular as to the financial position and prospects of the company, which caused investors to lose £500,000 in [a certain fund]."

22.     Shortly afterwards, the British press published articles about Haddow's disqualification.

23.     In July 2013, the U.K.'s Financial Conduct Authority ("FCA"), the Commission's approximate counterpart in the U.K., filed a court action against Haddow and others based on misconduct—unrelated to Branded Leisure or the conduct alleged in *SEC v. Haddow*—involving investments in African land.

24.     The FCA alleged that Haddow and others unlawfully promoted or operated "collective investment schemes" involving African land in Sierra Leone when Haddow and others were not authorized to do so and that the investment schemes were sold through misleading statements.

25.     In February 2014, after holding a trial on the preliminary issue of whether the schemes were "collective investment schemes," the High Court of Justice, Chancery Division, ruled that they were.

26.     On approximately February 17, 2014, the FCA's public website announced the High Court's ruling on the preliminary issue: "The High Court agreed with the FCA that the schemes were unauthorised collective investment schemes and could not be lawfully operated by the defendants."

27.     Shortly thereafter, articles mentioning Haddow's role in the proceeding and in the alleged schemes appeared in the British press, including on the Internet.

28.     In March 2015, the British Court of Appeal rejected Haddow's appeal of that preliminary judgment, and the FCA later announced that news on its website.

**B.      Haddow Controlled the Bar Works Companies.**

**1.      Haddow Founded, Owned, and Controlled Bar Works.**

29.     On approximately July 24, 2015, Bar Works was incorporated in Delaware.

30.     On July 29, 2015, Haddow purchased all of Bar Works' shares.

31.     On August 5, 2015, Haddow opened two bank accounts in Bar Works' name.

32.     The account opening forms for both accounts listed Haddow as the owner of Bar Works and as the sole authorized signatory on the accounts.

33.     On December 21, 2015, Haddow instructed a Brooklyn-based tax firm (the "Tax Firm") to register Bar Works Management as a corporation.

34.     On approximately December 24, 2015, Haddow opened two additional accounts in Bar Works' name.

35.     Haddow signed the account opening forms for both accounts as Bar Works' president and again listed himself on the account opening forms as the sole authorized signatory for both accounts.

36.     On approximately December 29, 2015, Haddow opened yet another account in Bar Works' name.

37.     The account opening forms listed Haddow as Bar Works' "President/ Chairperson," represented that Haddow owned 100% of Bar Works, and made clear that Haddow was the only authorized signatory on the account.

38.     On approximately February 5, 2016, Bar Works submitted an annual Delaware franchise tax report, which, authorized by Haddow under penalty of perjury, listed Haddow as Bar Works' only officer and director and listed his title as Bar Works' president.

2.     **Haddow Formed and Controlled 7th Avenue.**

39.     On January 26, 2016, Haddow emailed the Tax Firm and asked it to set up a new company, 7th Avenue, "for a new property we are taking on."

40.     The same day, the Tax Firm filed 7th Avenue's certificate of incorporation, which Haddow signed as 7th Avenue's incorporator, with New York State.

41.     On approximately February 4, 2016, Haddow opened two bank accounts for 7th Avenue.

42.     Haddow signed opening forms for both accounts as 7th Avenue's president, and the forms listed Haddow as the only authorized signatory on the accounts.

C.     **The Bar Works Companies Offered Securities Primarily in the Form of Coupled Leases and Sub-Leases, Which Functioned as Investment Notes.**

43.     In a press release dated September 8, 2015 (the "September 2015 Press Release"), Bar Works claimed to be "a new venture in the work space market, aiming to bring real vibrancy to the flexible working scene by adding full-service work spaces to former bar and restaurant premises in central city locations."

44.     In the September 2015 Press Release, Bar Works announced that in October 2015 it expected to open its first location, at 47 West 39th Street in New York, New York (the "39th Street Location"), which would "offer up to 200 work units, plus meeting and networking areas."

8

45.     The September 2015 Press Release claimed that it would earn revenue by "charg[ing] a flat monthly fee to users of [its] work spaces"—customers such as "entrepreneurs, freelancers and travelling employees" who wanted a workspace outside their homes—through monthly membership fees that included not only regular access to a workspace but also services such as internet access, photocopying, coffee, "[h]eavily discounted" alcoholic drinks, and technical support.

46.     The September 2015 Press Release stated that Bar Works expected to raise $440,000 in financing by "offering 20 work space units" at the 39th Street Location that it would offer "to investors on 10-year leases."

47.     From approximately October 2015 through April 2017, Bar Works primarily raised funds from investors by offering "leases" coupled with "sub-leases" on individual workspaces in at least five different Bar Works locations—often before Bar Works had opened the locations for business—in at least New York, New York and San Francisco.

48.     Bar Works generally offered investors a ten-year lease (the "Lease")—typically entitled a "Wealth Builder Lease Agreement"—on a numbered workspace in a particular Bar Works location named in the Lease.

49.     Bar Works or an affiliated entity typically served as the investor's counterparty—the purported "Landlord"—on the Lease.

50.     For example, 7th Avenue typically served as the counterparty on Leases for workspaces at Bar Works' 47 7th Avenue South location in New York, New York.

51.     The Leases typically purported to include the signature (or a blank space for the signature) of Black on behalf of the Bar Works' affiliate serving as the counterparty on the Lease.

52.     To purchase a Lease on an individual workspace, investors paid Bar Works or its affiliate an up-front, one-time purchase price (characterized in the Lease as "a single rent") generally ranging from $22,000 to $30,000, depending on the location of the workspace.

53.     Investors could purchase a single Lease covering one or more workspaces in the same Bar Works location or multiple Leases covering workspaces in different Bar Works locations.

54.     The Leases made clear that the Bar Works-affiliated entity serving as the "Landlord" was "solely responsible" for "payment of all utilities associated with the Property," "payment of all taxes associated with the Property," "retaining insurance on the Property," and "maintaining the Property" in a lawful condition and would "retain the sole right to alter the Property."

55.     Along with each Lease, each investor also signed a sub-lease ("Sub-Lease")— typically entitled a "Wealth Builder Sub-Lease Agreement"—for the Bar Works workspaces set out on the investor's Lease.

56.     A Bar Works affiliate, often Bar Works Management, typically served as the investor's counterparty on the Sub-Lease.

57.     The Sub-Leases typically purported to include the signature (or a blank space for the signature) of Black on behalf of the Bar Works' affiliate serving as the counterparty on the Sub-Lease.

58.     Under the terms of each Sub-Lease, Bar Works or its affiliate typically agreed to pay each investor back his full up-front purchase price for the corresponding Lease—which at least one Sub-Lease termed the "Total Investment amount"—at the end of the Lease's term, usually ten years.

59.     Under the Sub-Lease, the Bar Works affiliate agreed to pay the investor a fixed monthly "rental" fee, amounting to a percentage of the investor's original Lease purchase price, for the duration of the Lease's term.

60.     Bar Works typically offered a higher annual interest rate to investors who purchased Leases on more workspace units.

61.     For at least some time, Bar Works offered a 15% annual interest rate to investors who purchased Leases on two workspaces, a 15.5% annual interest rate to investors who purchased

Leases on three workspaces, and a 16% annual interest rate to investors who purchased Leases on five workspaces.

62.     For example, one couple paid $125,000 to "lease" five workspaces in a single Bar Works location, and in return Bar Works Management agreed to pay the couple a monthly fee of $1,667 for all five workspaces—16.00% annual interest on the couple's $125,000 investment.

63.     Under the terms of each Sub-Lease, Bar Works or its affiliate typically agreed to pay each investor at least the designated monthly interest fee for the Lease's duration (typically ten years), regardless of whether Bar Works or its affiliate could obtain a paying customer for the workspaces purportedly covered by the investor's Lease—that is, whether or not Bar Works received revenue from the relevant workspaces.

64.     Each Sub-Lease typically purported to offer some additional profit to the investor if Bar Works succeeded in increasing the price it charged a customer on the workspace purportedly covered by the investor's Lease, but the Sub-Leases typically provided no specifics about the initial price Bar Works would charge its customers for each workspace.

65.     The Bar Works Companies provided an application form (the "Application Form") to prospective investors to enable them to purchase Leases and Sub-Leases.

66.     At least certain versions of the Application Form stated: "You are required to complete the information contained in the attached documents."

67.     At least certain versions of the Application Form required Lease purchasers to return the completed forms to a Bar Works' location in New York, New York and to wire the funds for their purchases to a United States bank account held in the name of one of the Bar Works Companies.

68.     Many investors sent their investment funds directly to United States bank accounts held by the Bar Works Companies.

69.     Haddow and the Bar Works Companies pooled the investors' funds together in at least three bank accounts in the names of Bar Works and 7th Avenue.

70.     Haddow controlled all of these bank accounts and the accounts' disposition of investors' funds.

**D.      Haddow and the Bar Works Companies Defrauded Investors, Including By Touting a Fictitious CEO to Conceal Haddow's Control of the Companies.**

**1.      Bar Works' False and Misleading Investor Materials**

71.     The September 2015 Press Release announcing Bar Works' venture identified Bar Works' founder and chief executive as Jonathan Black.

72.     The press release contained a quote from Black and claimed that "Jonathan [Black] and his team have already secured US$500,000 of funding from a Silicon Valley backer."

73.     The press release touted Black's purported experience: "Jonathan has a background in finance and start-up ventures. He was a finance director/financial controller of two chains of bars in the UK (Regent Inns Plc – market value US$400m). He has also set up a number of new ventures, including recently 'Car Share', a car sharing APP."

74.     During at least the Relevant Period, Bar Works also operated a website: www.barworks.com.

75.     Haddow's name appeared nowhere in the September 2015 Press Release or on Bar Works' website during the Relevant Period.

76.     To sell Leases and Sub-Leases for particular Bar Works locations, Bar Works also typically provided potential investors—including through sales agents Defendants recruited—with one or more private placement memoranda specific to a particular Bar Works location (collectively, the "Bar Works Lease Memoranda").

12

77.     The Bar Works Lease Memoranda typically contained general content about the Bar Works Companies that varied little from memorandum to memorandum, in addition to information specific to the Bar Works location featured in each memorandum.

78.     At least one version of the Bar Works Lease Memoranda described Bar Works' Leases and Sub-Leases as follows: "Bar Works Wealthbuilder Program is the brand owned by Bar Works™ Inc. in which investors can purchase their own workspace on a 10 year lease and lease this back to Bar Works™ Management Inc. (its wholly owned subsidiary) for a fixed rental income."

79.     Haddow determined the content of the Bar Works Lease Memoranda and controlled their distribution.

80.     The Bar Works Lease Memoranda typically began with a "Letter from the Directors," purportedly signed by Black as "Chief Executive, Bar Works Inc."

81.     Haddow's name appeared nowhere in the Bar Works Lease Memoranda.

82.     The representations and omissions described above in at least the September 2015 Press Release, Bar Works' website, and the Bar Works Lease Memoranda were false or misleading.

83.     In reality, "Jonathan Black" was a fictitious name for a person who did not exist, and Haddow in fact founded, controlled, and owned the Bar Works Companies and their affiliates.

### 2.     Haddow's Misappropriation and the Scheme's Unraveling

84.     Haddow later misappropriated at least some of the funds investors invested in the Bar Works Companies for his own use. For example, of the investor funds the Bar Works Companies raised by selling the Leases and Sub-Leases, Haddow transferred over $4 million to one or more accounts in Mauritius and $1 million to one or more accounts in Morocco.

85.     The Bar Works Companies and their affiliates stopped paying Lease investors monthly interest fees after approximately April 2017.

86.     In June 2017, Haddow left the United States as his scheme unraveled.

87.     Bar Works, 7th Avenue, and Bar Works Management are now defunct, and the Bar Works Leases and Sub-Leases sold to investors are effectively worthless.

II.     **Defendants Aided and Abetted the Fraud.**

    A.     **Moore Knew About the FCA's Prior Regulatory Action Against Haddow.**

88.     In approximately 2010 or 2011, Moore met Haddow in London, through a mutual business acquaintance.

89.     Over the next few years, Moore and Haddow met several times, including in the U.K. and in Florida, and kept in touch.

90.     By at least mid-2015, Moore became aware that Haddow had had a business venture involving African land.

91.     Moore understood that Haddow had set up a global network of agents to sell an African land-related project.

92.     During the Relevant Period, Moore knew about the FCA's regulatory action, based on conduct involving an African land scheme, against Haddow.

93.     Indeed, on March 20, 2016, Moore emailed Haddow with a link to the FCA's website post about its lawsuit against Haddow and wrote: "See you're still getting plenty of AirPlay from these guys… Seemingly this was just last Friday…"

    B.     **Knowing Haddow Controlled Bar Works, Moore Entered Into an Arrangement to Sell Leases to Investors Through a Sales Agent Network.**

94.     In approximately mid-2015, Haddow told Moore about a new project Haddow was working on involving service offices.

95.     Moore pitched Haddow on the idea of partnering on the project together.

96.     Shortly afterwards, Moore and his wife met Haddow for dinner in New York, New York and discussed Haddow's business project (which became Bar Works).

97.     Haddow told Moore that Haddow wanted to control the whole business himself rather than partner with Moore.

98.     In later discussions after that dinner, Haddow told Moore that Haddow had come up with a way to sell work-space leases to investors.

99.     In these later discussions, Haddow continued to make clear to Moore that Haddow wanted to control the whole business.

100.    Moore and Haddow eventually agreed that Moore would recruit a "master agent" company that had a global network of sales agents (the "Sales Company")—with whom Moore had a prior relationship—to sell Bar Works' work-space leases.

101.    Moore and Haddow agreed that the Sales Company would receive a commission of 30% of the amount the Sales Company raised for Bar Works through the sale of work-space leases and that Moore would receive an additional significant sales commission for the Sales Company's sales to investors.

102.    Moore knew that Haddow made all important decisions with respect to Bar Works.

103.    For example, in late November 2015, Haddow considered increasing the rate of annual fixed return the Bar Works Leases would offer investors, based on a comment from a Bar Works sales person. Haddow became concerned that an 8% fixed return would not be sufficient to persuade investors to purchase Leases.

104.    On November 27, 2015, in an email to Moore and others, Haddow expressed his decision to offer investors fixed returns ranging from 13% to 16%, depending on how many work space Leases an investor bought: "I have increased the single unit to 13%."

105.    Moore further knew that "Renwick [Haddow] and Bar Works, or Renwick, appeared to want to control everything very, very tightly, you know, in every single way," particularly Bar Works' marketing materials, as Moore later admitted in an interview.

15

### C.   By At Least March 2016, Moore Knew That Black Was Fictitious.

106.   During the Relevant Period, Moore visited Bar Works' 39th Street Location and two other Bar Works' locations in New York City.

107.   Although Moore regularly communicated with Haddow about Bar Works during the Relevant Period, Moore never met or spoke with Black.

108.   On November 5, 2015, Moore emailed Haddow alone with the text of a draft letter, purportedly from Black in his role as Bar Works' CEO and designed to "satisfy any investor / [sales] agent enquiries" about Bar Works. Moore asked Haddow: "Mate[,] see what you think to this please and if its [*sic*] ok lets [*sic*] get it on headed paper.. as a pdf."

109.   Less than two weeks later, on November 16, 2015, a Sales Company executive emailed Moore to ask him to "please ask Jonathan [Black] to cut and paste" the text of a letter that the executive had drafted on Black's behalf to be signed by Black, "on to an official B[ar]W[orks] letterhead."

110.   Moore forwarded the Sales Company executive's email to a Bar Works employee (the "Bar Works Employee") and asked her: "Can you please do me another of these cut and paste letters as below?"

111.   The Bar Works Employee, copying Haddow, replied to Moore: "Yep[,] that's fine if ok with Renwick [Haddow] for me to do?"

112.   Haddow replied to the Bar Works Employee and Moore: "Yes."

113.   On January 13, 2016, Moore emailed a different prospective sales agent with a proposed agreement. The sales agent replied to Moore, and copied Black's purported email address, with a question about the Leases' buy-back provision, by which Bar Works agreed to buy back the Leases from investors after ten years.

114.    Moore forwarded the email only to Haddow—and not to Black's purported email address—and asked Haddow: "And how does Jonathan [Black] want to explain the buy back rationale to [the sales agent]?"

115.    Haddow replied to Moore: "Although the structure takes the form of a lease, because it is a short lease then a residual element has been built into the lease so that the owner receives his initial capital back (not 125%). It is effectively a reversionary interest. Some old [expletive] like that anyway."

116.    On March 2, 2016, an executive at another company with a network of sales agents emailed Moore about his team's upcoming visit to New York to meet with Bar Works. The executive asked: "[D]o we need to bring some professional video equipment to record some clips with Jonathan [Black] etc?"

117.    The next day, Moore forwarded the executive's email to Haddow and wrote (with ellipses in original): "How do we feel we can overcome the Jonathan issue…?? 'He's on honeymoon…!?!?'??"

118.    At the time he sent the email, Moore knew that Haddow was in fact traveling on his own honeymoon.

119.    The same day, Haddow replied: "They can meet [a Bar Works sales person] and [Haddow's wife] and our new PR. That should be enough and you guys can keep them occupied."

120.    The next day, on March 4, 2016, Moore responded: "Ok. Would be great to find a way to get you involved but equally understand your reticence. We will need a story as to why Jonathan isn't there."

**D.     Moore Facilitated the Sales of Bar Works Leases to Investors Through Misleading Marketing Materials and Lied to a Prospective Sales Agent.**

121.    During the Relevant Period, Moore acted as an intermediary between Haddow and the Bar Works Companies, on the one hand, and sales agent networks, on the other hand, including with respect to the Bar Works Companies' false and misleading marketing materials.

122.    In approximately September 2015, Moore introduced the Sales Company to Bar Works and began facilitating the Sales Company's sales of the Leases to investors around the world.

123.    On September 21, 2015, Moore sent an email to the Sales Company's chief operating officer ("COO") and asked: "Can we make a plan to get some marketing started for this ASAP? I think with the incredible materials they have…we can answer any and all questions anyone may have. All we need now is… Wait for it… Leads!"

124.    In reply, the Sales Company's COO asked for specific documentation and raised a concern about the need for "some sort of track record from the developer [Bar Works] of what they have done previously."

125.    Moore forwarded the COO's email to Haddow to seek a response. Haddow then replied to Moore about the COO's track record concern: "Bull[expletive]. They need to overcome this one. It won't even be an issue."

126.    Approximately two weeks later, on October 7, 2015, Moore emailed the Bar Works Employee, with a copy to Haddow, to ask the employee to create a "dropbox account" for sales agents selling Bar Works Leases to investors. Moore asked the Bar Works Employee to include in the Dropbox account "everything an agent may need such as…[b]rochures and all marketing materials" and to "[l]iase with Renwick [Haddow] regarding what's available for it and when."

127.    On October 12, 2015, Moore asked the Bar Works Employee to "let us have that Dropbox link to the finished documents asap…. [W]e[']re trying to get a client on board for a couple of deals."

128.    The next day, a Bar Works administrator emailed the Bar Works Employee, Moore, Haddow, and others five attachments in pdf format and wrote: "These are for Investors."

129.    The attachments included a Bar Works private placement memorandum for a private equity placing and convertible loan note offering. Like the later Lease Memoranda, the private placement memorandum attachment contained a "Letter from the Directors," purportedly signed by Black as "Chief Executive, Bar Works, Inc.," and touted Black's background "in finance and startup ventures" as "a finance director/financial controller of two chains of bars in the UK (Regent Inns Plc – market value $400m)" and as an entrepreneur who "has also set up a number of startup ventures including recently Car Share which is a car sharing APP."

130.    None of the five pdf documents attached to the Bar Works administrator's email to Moore contained any mention of Haddow.

131.    On November 30, 2015, Moore emailed the Bar Works Employee again and asked: "I have a friend…who is keen to help us recruit agents for barworks[.] He doesn't use Dropbox…. Would you be so kind therefore as to send him all the marketing documents from our agent Dropbox so that he can start assessing things…? … [P]lease copy me on everything so I can see what he has received and know what to discuss with him." In response, the Bar Works Employee attached marketing documents to Moore by email.

132.    On December 3, 2015, Moore asked the Bar Works Employee to send "barworks agent marketing materials" to a sales agent, whom Moore had copied on the email.

133.    Two days later, on December 5, 2015, Bar Works, through an info@barworks.nyc email address, sent Moore and the Sales Company COO an email attaching one of the Bar Works

Lease Memoranda, the memorandum for the 39th Street Location. The email stated in part: "Final brochure attached."

134.    The memorandum Moore received contained the same or similar false and misleading information as the Bar Works Lease Memoranda described in paragraph 78 through 81 above.

135.    The memorandum Moore received also included an Application Form that investors who decided to purchase Leases were "required to complete."

136.    That Application Form required Lease purchasers to return the completed forms to Bar Works' 39th Street Location and to wire the funds for their Lease purchases to a bank account located in New York, New York and held in Bar Works' name.

137.    On February 11, 2016, Moore emailed an individual who had a sales agent network to discuss the prospect of the individual's network selling the Leases to investors. While Moore copied Black's purported email address, Moore did not copy Haddow.

138.    In his email, Moore claimed that Bar Works had a "deep level of commercial and forensics experience," including "Jonathan Black – Regent Inns Plc – Jonathan was the primary originator of barworks prior to us becoming involved (at the formation stage) with this small and tight team. …He has experience of venture capital, along with fundraising at a corporate and regulated level, and of course management of public companies at board level."

139.    From January through May 2016, Moore's efforts led to the Sales Company's sales of at least $5 million of Leases to dozens of investors.

140.    Indeed, in April and May 2016 alone, the Sales Company's agents sold Leases to approximately thirty investors.

141.    From November 2015 through May 2016, Moore in turn received over $1.4 million in commissions from Bar Works—through two United States bank accounts in Voicetech's name—for the Sales Company's sales of Leases to investors.

### FIRST CLAIM FOR RELIEF
#### Aiding and Abetting Violations of Securities Act Section 17(a)
#### (Against Both Defendants)

142.    The Commission realleges and incorporates by reference here the allegations in paragraphs 1 through 141.

143.    As alleged above, Haddow, Bar Works, and 7th Avenue violated Securities Act Section 17(a) [15 U.S.C. § 77q(a)].

144.    Defendants knowingly or recklessly provided substantial assistance to Haddow, Bar Works, and/or 7th Avenue with respect to the violations of Securities Act Section 17(a) [15 U.S.C. § 77q(a)] by each of them.

145.    By reason of the foregoing, Defendants are liable pursuant to Securities Act Section 15(b) [15 U.S.C. § 77o(b)] for aiding and abetting the violations of Securities Act Section 17(a) [15 U.S.C. § 77q(a)] by Haddow, Bar Works, and/or 7th Avenue.

### SECOND CLAIM FOR RELIEF
#### Aiding and Abetting Violations of Exchange Act Section 10(b) and Rule 10b-5
#### (Against Both Defendants)

146.    The Commission realleges and incorporates by reference here the allegations in paragraphs 1 through 141.

147.    As alleged above, Haddow, Bar Works, and 7th Avenue violated Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

148.    Defendants knowingly or recklessly provided substantial assistance to Haddow, Bar Works, and/or 7th Avenue with respect to the violations of Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5] by each of them.

149.    By reason of the foregoing, Defendants are liable pursuant to Exchange Act Section 20(e) [15 U.S.C. § 78t(e)] for aiding and abetting the violations of Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5] by Haddow, Bar Works, and/or 7th Avenue.

## PRAYER FOR RELIEF

**WHEREFORE**, the Commission respectfully requests that this Court enter a Final Judgment:

## I.

Permanently enjoining Defendants and each of their agents, servants, employees and attorneys and all persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise from violating, directly or indirectly, Securities Act Section 17(a) [15 U.S.C. § 77q(a)], Exchange Act Section 10(b) [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5];

## II.

Ordering Defendants, jointly and severally as appropriate, to disgorge with prejudgment interest all ill-gotten gains from the conduct alleged in this Complaint;

## III.

Ordering Defendants to pay civil money penalties under Securities Act Section 20(d) [15 U.S.C. § 77t(d)] and Exchange Act Section 21(d)(3) [15 U.S.C. § 78u(d)(3)]; and

IV.

Granting any other and further relief this Court may deem just and proper.


Dated:  New York, New York
        August 27, 2018

MARC P. BERGER
REGIONAL DIRECTOR
Lara Shalov Mehraban
Sandeep Satwalekar
Preethi Krishnamurthy
Christopher J. Dunnigan
Alison R. Levine
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
Brookfield Place
200 Vesey Street, Suite 400
New York, New York 10281
(212) 336-0116 (Krishnamurthy)